IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| MARVEL JONES,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>KATHY HERIAN, ET AL., in their individual<br>capacitates only,<br><br>　　　　　Defendants. | **8:20-CV-365**<br><br>**MEMORANDUM AND ORDER ON<br>DEFENDANTS' MOTION FOR<br>SUMMARY JUDGMENT AND<br>PLAINTIFF'S MOTIONS FOR<br>INJUNCTIVE RELIEF** |

This case was brought *pro se* by Plaintiff Marvel Jones, a civilly committed sex offender at the Norfolk Regional Center (NRC) in Norfolk, Nebraska. *See generally* Filing 12. Jones initially sued over 90 individuals for an assortment of constitutional violations. *See generally* Filing 1; Filing 60 at 3. Seventeen (17) Defendants remain. *See* Filing 60 at 12; Filing 109 at 1. They are: (1) Kathy Herian, (2) Rosetta McAllister, (3) Dawn Collins, (4) Kris Boe Simmons, (5) Hunter Lewis, (6) Matthew Lewis, (7) Kolten Neuhaus, (8) James Johnson, (9) Tyler Stender, (10) Cameron Liewer, (11) Edgar Olivan, (12) Corey Banks, (13) Stephanie Owens, (14) Don Whitmire, (15) Josh Deiterman, (16) Chris Neuhaus, and (17) Drew English. Filing 60 at 12; Filing 109 at 1. The remaining claims allege an unlawful search, an unlawful seizure, and a violation of procedural due process. The matter now before the Court involves several filings submitted by the parties. The Court will address the matters raised in these filings together in this Order. After considering the parties' submissions, relevant portions of the record, and applicable authority, the Court takes the following actions: (1) Jones's Motion to Compel is denied; (2) Jones's Motion for Restraining Order is denied; and (3) Defendants' Motion for Summary Judgment is granted. Accordingly, this case is terminated.

# I.  BACKGROUND

## A.  Factual Background

Jones is presently committed to the NRC pursuant to Nebraska's Sex Offender Commitment Act, Neb. Rev. Stat. §§ 71-1201, *et seq*. Filing 109 at 10 (¶1). NRC is a 120-bed Sex Offender Treatment Center that administers a Sex Offender Treatment Program. Filing 107-11 at 1 (¶3). "The primary purpose[s] of the Program [are] to reduce the likelihood of additional sexual offenses, avoid creating additional victims, and develop skills for successful community integration." Filing 107-11 at 1 (¶3). Jones was first committed to NRC in 2018 after serving 21 years in prison following his 1996 conviction for First Degree Sexual Assault of a Child. Filing 106-1 at 2. Although Jones was briefly transferred to a different facility in 2020, he was re-admitted to NRC in late 2020 after he shoved and physically intimidated a peer at the other facility. *See* Filing 106-5 at 2, 6; Filing 107-11 at 4 (¶9).

### 1.  *Background Relevant to Jones's Fourth Amendment Claims*

#### a.  The Seizure Claims

Jones alleges that on the day he was re-admitted to NRC, Defendant Kris Boe Simmons told him that she was going to go "through all of [his] property and search it." Filing 12 at 31 (lowercase typeface substituted). Jones claims that he had 11 boxes of property, and that Simmons directed a number of unnamed individuals to go through his "legal documents, legal mail, personal mail from family members, friend, [and] legal organizations such as the A.C.L.U., the Innocence Project of New York, the Mid-West Innocence Project." Filing 12 at 31 (lowercase typeface substituted). According to his Amended Complaint, Jones contends that he is "missing certain leagal [sic] document such as case laws [sic], attorney's phone-numbers [sic], United States Codes Constitutions, [and] three (3) copies of [his] treatment schedules list[.]" Filing 12 at 31 (lowercase typeface substituted). Jones further alleges in his Amended Complaint that "they" destroyed some

2

of his personal paperwork such as notes, company addresses, phone numbers, and various catalogs. Filing 12 at 31. In one of his interrogatory answers, Jones similarly averred that on the date that he was re-admitted to NRC, "Defendant Kris Boe Simmons, and the other Defendants conspired together and search[ed] through [his] legal documents, personal letter [sic], missing legal papers, legal notes, reading [sic] legal documents, reading [sic] personal letters from family member [sic], friends, attorneys, taking [sic] personal magazines of Plaintiff." Filing 107-9 at 2 (lowercase typeface substituted).

According to a property inventory record maintained by NRC, four boxes of "legal papers" were delivered to Jones's "unit" at NRC approximately three days after Jones was re-admitted. *See* Filing 106 at 2; Filing 106-9 at 2; *see also* Filing 109 at 12 (¶9). Several books, including a Black's Law Dictionary, an "American Heritage Dictionary, a Bible, and a Prisoner's Self Help Manual, were subsequently sent to Jones's unit approximately 10 days after he arrived back at NRC. *See* Filing 106 at 2; Filing 106-9 at 2; *see also* Filing 109 at 12 (¶9). Defendants acknowledge that "upon readmission to NRC . . . it took several days for four boxes of Jones's legal papers to make its way to Jones's living unit[.]" Filing 109 at 18. They also acknowledge there was "delay" caused by "retaining and searching Jones's property for several days upon readmission," but they contend this delay was "necessary" and did "not violate clearly established law[.]" Filing 109 at 19.

### b. The Search Claims

Liberally construed, Jones's Second Amended Complaint also alleged a Fourth Amendment unlawful search claim. *See* Filing 12 at 17, 31, 34–35. As the Court will explain in more detail below, at this stage in the litigation the only Defendants implicated in this claim are Deiterman and Chris Neuhaus. *See* Filing 109 at 2; Filing 60 at 12; Filing 63 at 3–6. Both Deiterman and Chris Neuhaus admit that they "have, on various occasions, conducted security searches of Jones's room pursuant to NRC policy." Filing 109 at 13 (citing Filing 106-10 at 1–4).

3

"NRC Policy provides, among other things, that random security searches are performed on all patients and their rooms, cubbies, and personal box at least monthly." Filing 109 at 13 (citing Filing 107-15 at 1–2 and Filing 107-16 at 2 (¶5)).

    *2.  Background Relevant to Jones's Procedural Due Process Claims*

       Jones's Amended Complaint references three occasions where he was allegedly accused of rule violations implicating his procedural due process rights. *See* Filing 12 at 18 (¶34). Senior Judge Kopf described Jones's procedural due process claims as follows when he entered his screening order on June 9, 2021:

> [Jones] alleges that when he was accused of rule violations in three instances, he did not have the right to address the allegations and evidence against him at a disciplinary hearing, to present witnesses on his behalf, to have legal assistance, to prepare a defense, or to appeal the decisions of the treatment team. [Jones] claims that these accusations have caused an increase in the duration of his confinement, effected his "scoring levels," and caused privilege suspension without notice.

Filing 13 at 7.

       Jones's Amended Complaint describes the first occasion as involving an allegation about "breaking boundaries against another peer for sexual favors[.]" Filing 12 at 18 (¶34) (lowercase typeface substituted). He describes the second occasion as involving an incident at the "unit 3-East bathroom" where he was alleged to have engaged in a "sexual actout" with another peer. Filing 12 at 18 (¶34) (lowercase typeface substituted). He describes the third occasion as involving an allegation that he was too close to two fellow peers. Filing 12 at 18 (¶34). However, when Jones was asked to elaborate on the factual predicates for his due process claims in discovery, he only referenced the latter two incidents. *See* Filing 107-4 at 5; Filing 107-5 at 1. He made no mention of an allegation about "breaking boundaries against another peer for sexual favors" at that time. *See* Filing 107-4 at 5; Filing 107-5 at 1; *see also* Filing 109 at 13 n.6.

4

Specifically, he said:

(1) Plaintiff were accused [sic] of a Sexual Act Out on 3-East back in 2019 with another peer; (2) Two fellow peers accused Plaintiff of getting to [sic] close to them, Team viewed the video cameras and founded [sic] those allegations were unfound [sic]. The Treatment Team put a 10 Foot Order on me to stay away from the two (2) peers on November 13, 2019. On 13 of November, Plaintiff [sic] duration of confinement has increased here at Norfolk Regional Center. Plaintiff [sic] due process rights to (1) a notice of the charges, (2) hearings: the right to hear and be heard, (3) a right to have witnesses, (4) the right to confrontation and cross-examination of witnesses, (5) the right to documentary and physical evidence, (6) the right to assistance of counsel, (7) a right to a promp [sic] hearing, (8) a right to an impartial decision maker.

Filing 107-5 at 1 (lowercase typeface substituted).

## B. Procedural Background

After Senior Judge Kopf screened Jones's case, he concluded that three of his claims could go forward. Filing 13 at 12. Each of these claims were brought under 42 U.S.C. § 1983 and included: (1) a violation of Jones's Fourth Amendment rights; (2) a violation of Jones's substantive due process rights; and (3) a violation of Jones's procedural due process rights. Filing 13 at 12. The applicable Defendants subsequently challenged whether Jones's Fourth Amendment and substantive due process claims stated offenses in accordance with Rule 12(b)(6) of the Federal Rules of Civil Procedure. Filing 56 at 1; Filing 58 at 1; Filing 60 at 4.

On December 2, 2021, this Court issued a written Order granting the Defendants' Motion to Dismiss Jones's substantive due process claim in full. Filing 60 at 12. That Order also granted the Defendants' Motion to Dismiss Jones's Fourth Amendment claims in part. Filing 60 at 12. The Court dismissed Jones's Fourth Amendment claims predicated on unlawful searches but permitted Jones's Fourth Amendment claims predicated on unlawful seizures to go forward. Filing 60 at 11–12. The Court permitted the seizure claims to go forward because it could not adequately consider Defendants' qualified immunity defense on those claims at that early stage. Filing 60 at 11–12. However, Defendants Deiterman and Chris Neuhaus had not yet been served at the time the Court

5

issued its Order dismissing the unlawful search claims on December 2, 2021. *See* Filing 63 at 3–6; Filing 66 at 3; Filing 67 at 3; *see also* Filing 69 at 2; Filing 71 at 2.

Jones subsequently submitted a filing captioned "Motion to Compell [sic] Defendants to Stop Harassing/Intimidation/Retaliation For Filing the Above Civil Action" (Motion to Compel). Filing 89 at 1. Defendants requested and received an extension to respond to Jones's Motion to Compel along with their forthcoming Motion for Summary Judgment. Filing 90 at 1–2; Filing 91 (Text Order).[1] Before Defendants did so, however, Jones submitted another filing captioned "Motion for Restraining Order." Filing 94 at 1. Defendants responded to Jones's "Motion for Restraining Order." Filing 1 at 14. Jones then submitted a document captioned "Objection to Dismiss." Filing 103 at 1.[2] Thereafter, on January 4, 2023, Defendants filed a Motion for Summary Judgment. Filing 104 at 1. Jones submitted an opposition brief on February 17, 2023. Filing 113.[3] Finally, on March 3, 2023, Defendants submitted a reply brief regarding their Motion for Summary Judgment. Filing 114 at 1.[4]

---

[1] Defendants subsequently requested and received more extensions. *See* Filing 92 at 1; Filing 93 (Text Order); Filing 95 at 1; Filing 96 (Text Order); Filing 97 at 1; Filing 98 (Text Order); Filing 101 at 1; Filing 102 (Text Order).

[2] The Court understands and construes this filing to be a reply brief rather than a separate motion seeking independent relief. The prefatory sentence says "COMES NOW Plaintiff, Marvel Jones, Pro Se, Object to Defendants Motion to Dismiss Plaintiff Motion for Restraining Order." Filing 103 at 1 (lowercase typeface substituted). The filing similarly concludes by requesting that the Court grant his Motion for a Restraining Order. Filing 103 at 2.

[3] Initially, Jones missed the deadline for filing his opposition brief; however, he subsequently submitted a motion for an enlargement of time out of time. Filing 111. Although it was untimely by one day, the Court granted Jones's motion for an extension. Filing 112. Thereafter, Jones submitted his opposition brief within the extension window. Filing 113.

[4] On March 13, 2023, Jones also submitted a filing he captioned "Respond to Defendant Reply Brief In Against Their Motion for Summary Judgment." Filing 115 at 1. The Court understands this to be a sur-reply brief. There is no provision in either the Federal Rules of Civil Procedure or the Court's local rules expressly authorizing the filing of a sur-reply brief. NECivR 7.1(c)(3) may permit the filing of a sur-reply brief, but only with leave of the court. Jones did not request leave of the Court to file this sur-reply, nor did he offer any reason why this Court should entertain such a filing. Whether to allow a sur-reply is a matter in the court's discretion. *See Postawko v. Missouri Dep't of Corr.*, 910 F.3d 1030, 1037 n.3 (8th Cir. 2018). The Court concludes that there is no reasonable need to depart from the general prohibitions on sur-reply briefs in this case. Although the Court has reviewed Filing 115, the Court will not consider it in resolving the matters presently pending before it.

Deiterman and Chris Neuhaus take the position that although they were not parties to the prior motion to dismiss, "the same rationale the Court applied in its previous dismissal of the Fourth Amendment unlawful search claim should apply to" them. Filing 109 at 22. Thus, the claims that remain at this stage are: (1) an unlawful search claim against Deiterman and Chris Neuhaus; (2) an unlawful seizure claim against Boe Simmons, Hunter Lewis, Matthew Lewis, Kolten Neuhaus, Johnson, Stender, Liewer, Olivan, Banks, Owens, Whitmire, Deiterman, Chris Neuhaus, and Drew English; and (3) a procedural due process claim against Herian, Collins, and McAllister. The applicable Defendants involved in each claim argue that they are entitled to summary judgment. *See generally* Filing 109.

## II.  LEGAL ANALYSIS

### A.  Jones's Motions for Injunctive Relief

Before addressing Defendants' Motion for Summary Judgment, the Court will first consider Jones's motions seeking injunctive relief.

#### 1.  Jones's "Motion to Compel"

Jones submitted a filing captioned "Motion to Compel Defendants to Stop Harassing/Intimidation/Retaliation for Filing the Above Civil Action." Filing 89 at 1. This "Motion to Compel" is specifically directed at "Defendants [Brittany] Marker [and] Josh [Deiterman]" and seeks an Order from the Court directing these two individuals "to stop harassing [Jones] during shakedowns of [his] room searches." Filing 89 at 1 (lowercase typeface substituted). Specifically, Jones prays that this Court "enjoin" these individuals (and other individuals who are not a party to this suit) from "harassing" him. Filing 89 at 2. At the time Jones filed this Motion to Compel, Brittany Marker was no longer a party to this case. Brittany Marker was terminated from this case many months before by order of the Court on December 2, 2021. *See* Filing 60 at 12.

Jones's Motion to Compel addresses three different issues. The first issue—which he captions "COMPLAINT ISSUE'S No. 1"—claims that on September 28, 2022, Marker told him that that he had to put his legal documents in a back room. Filing 89 at 1. Jones says that he told Marker she was incorrect and that he had a right to keep up to two boxes of legal papers in his room by law. Filing 89 at 1. Jones does not say whether Marker insisted or relented. *See* Filing 89 at 1–2. It is unclear from Jones's Motion what happened next. *See* Filing 89 at 1–2.

The second issue—which Jones captions "COMPLAINT ISSUE'S No. 2"—alleges that on June 3, 2022, Deiterman was conducting a search of Jones's room without allowing Jones the opportunity to be present while he was searching through Jones's legal documents. Filing 89 at 2. Jones says that he told Deiterman he did not have any right to go through his legal papers without his consent and outside of his presence. Filing 89 at 2. According to Jones, Deiterman said that no one had ever told him he could not go through his legal papers or read his personal notes and private papers. Filing 89 at 2. Jones does not say what happened next. Filing 89 at 2.

The third and final issue—which Jones captions "COMPLAINT ISSUE'S No. 3"—says that on September 30, 2022, an NRC supervisor sent Deiterman to conduct a "shakedown" of Jones's room outside of Jones's presence. Filing 89 at 2. Jones says that he told Deiterman he had "no business" in his room because he "had him on a civil action." Filing 89 at 2 (lowercase typeface substituted). Jones claims that Deiterman began to go through his legal documents and that Jones told him he was not allowed to do this "because the Court gave me the claim against him and the other[] security team members." Filing 89 at 2 (lowercase typeface substituted). According to Jones, Deiterman then left his room. Filing 89 at 2.

   *2.  Jones's "Motion for Restraining Order"*

After Jones filed his "Motion to Compel," but before the Defendants filed their Motion for Summary Judgment, Jones filed a "Motion for Restraining Order." Filing 94 at 1. This Motion

takes issue with NRC's "12-inch paper rule." Filing 94 at 1–2. As Defendants acknowledge, "NRC policy provides that patients are permitted to have a total of 12 inches of paper in their room, stacked" and "legal papers" are included within this limit as well. Filing 109 at 8.[5] Jones notes in his Motion that due to the number of pending legal actions he has initiated, he has accumulated four boxes of legal materials. Filing 94 at 1. However, he claims that on October 12, 2022, NRC staff told him that he had seven days to pack up his legal materials so that they could be stored in the back room of his housing unit. Filing 94 at 1. Despite Jones's insistence that he was entitled to at least two cubic feet of legal documents in his room, he claims that "James Beaver and Defendant Joshua A. Deiterman took all of [his] legal documents and legal papers out of [his] room and put them in the storage room without [his] consent." Filing 94 at 1 (lowercase typeface substituted). Jones argues that he needs access to his legal documents, which in his view means that he must be allowed to keep at least two cubic feet worth of legal papers in his room at NRC to provide him with meaningful access to courts. Filing 94 at 1. Accordingly, he seeks a "restraining order" preventing Defendants from applying NRC's 12-inch paper rule. Filing 94 at 1.

   *3. Discussion*

   Jones has failed to establish a relationship between the injuries he asserts in these Motions and the conduct involved in his Complaint. *See Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) (per curiam); *Hale v. Wood*, 89 F.3d 840, 840 (8th Cir. 1996) (Table). At the time Jones

---

[5] Per NRC policy, a civilly committed patient like Jones is limited to the amount of paper he can possess in his room at a given time—specifically, up to 12 inches of paper (including "legal papers") when stacked together. Filing 107-12 at 41. All paper is included within the 12-inch limit, including a patient's legal papers. Filing 107-12 at 41. The rationale for only allowing 12 inches of loose paper at a time in a patient's room is that "excessive amounts of paper can become a fire hazard, can be used by patients to clog drains and foils to cause flooding, and can even be used as a dense blunt object and weapon when stacked and bound together." Filing 109 at 8 (citing Filing 107-11 at 7 (¶19)). However, patients are also allowed to have up to eight books in their room that are not counted toward the 12-inch limit. Filing 107-12 at 41. Patients are also allowed to store excess paper in one 18 x 12 x 12 box on their living unit. Filing 107-12 at 49. In addition to what they may store in their room and their living unit, patients are further allowed to store excess paper in two 18 x 12 x 12 boxes with NRC's Patient Services. Filing 107-12 at 49. However, patients may only access their materials stored with Patient Services once per month. Filing 107-2 at 49.

filed these Motions for injunctive relief, the only claims that remained all allegedly took place prior to 2022. *See generally* Filing 12 (filed on March 11, 2021). The matters he complains of in these two Motions all occurred in 2022. "[A] preliminary injunction may never issue to prevent an injury or harm which not even the moving party contends was caused by the wrong claimed in the underlying action." *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997) (relying on the Eighth Circuit's decision in *Devose*, 42 F.3d at 471). Accordingly, the Court will deny both of these Motions.

The Court will first address Jones's "Motion to Compel," in which he asks the Court to "enjoin" individuals at NRC "from harassing him[.]" Filing 89 at 2. The Eighth Circuit considered a similar situation in *Hale*, 89 F.3d at 840. Much like the present case, the prisoner-plaintiff in *Hale* sued various corrections officials pursuant to 42 U.S.C. § 1983. *Hale*, 89 F.3d at 840. He later sought injunctive relief and "requested the court enjoin defendants from retaliating against him" based on his claims that the "defendants had threatened to, and intended to, punish or injure him, and that such threats constituted evidence of irreparable harm." *Id.* However, the Eighth Circuit "reject[ed] Hale's contention that [the] defendants' allegedly threatening and retaliatory behavior mandate[d] granting injunctive relief because Hale failed to establish a connection between these injuries and the conduct he challenged in his complaint." *Id.* The same is true here. Nothing that Jones complains of in his Motion to Compel bears any connection to the claims that remained at the time he filed the Motion. The plaintiff's request to "enjoin defendants from retaliating against him" in *Hale* was properly denied on this basis. Therefore, the Court will do the same and deny Jones's request "to enjoin the Defendant from harassing him[.]" *See* Filing 89 at 2 (lowercase typeface substituted).

The Court reaches a similar conclusion on Jones's "Motion for Restraining Order." In *Devose*, the Eighth Circuit explained that a motion for a preliminary injunction was "based on new assertions of mistreatment that [were] entirely different from the claim raised and the relief requested in his inadequate medical treatment lawsuit." *Id.* Therefore, while the plaintiff's "new assertions might support additional claims against the same prison officials, they [could not] provide the basis for a preliminary injunction in [that] lawsuit." *Id.* The same is true here. At the time Jones filed his "Motion for Restraining Order," his only remaining claims before the Court were his Fourth Amendment and procedural due process allegations. *See* Filing 60 at 12. These specific claims have no relation to the 12-inch paper rule at NRC given that the 12-inch paper rule did not cause the wrongs he has claimed in this case. Jones's issues with the 12-inch paper rule are "unrelated to the issues he raised in his complaint." *Frye v. Minnesota Dep't of Corr.*, No. 05-1327JNEJJG, 2006 WL 2502236, at *1 (D. Minn. Aug. 29, 2006). Accordingly, even if the Court were to assume "for the sake of argument that the seizure of his papers is unlawful, he cannot obtain a preliminary injunction." *Id.* Jones's "Motion for Restraining Order" is denied.

## B. Defendants' Motion for Summary Judgment

Having concluded that Jones's Motions seeking injunctive relief are meritless, the Court will now consider the Defendants' Motion for Summary Judgment.

### 1. Preliminary Considerations

When Defendants filed their Motion for Summary Judgment, they contemporaneously submitted a supporting brief and two indices of evidence relevant to their Motion. Filing 104; Filing 106; Filing 107; Filing 109. Save for one minor discrepancy, these filings were submitted

in substantial compliance with this Court's local rules for filing summary judgment motions and supporting materials. *See* NECivR 7.1; NECivR 56.1.[6]

Jones submitted his opposition brief on February 17, 2023. Filing 113.[7] Unlike the Defendants' filings on this Motion, Jones's opposition brief does not substantially comply with this Court's local rules. Specifically, the local rules state that a "party opposing a summary judgment motion must file a brief and a separate statement of concise responses to the moving party's statement of material facts" and that this statement "should consist of separate numbered paragraphs corresponding to the numbered paragraphs in the movant's brief[.]" NECivR 56.1(b)(1)(A). Additionally, the local rules provide that "[e]ach response must clearly state that the asserted fact is (i) undisputed; (ii) disputed, or (iii) undisputed in part and disputed in part." NECivR 56.1(B). The Court's local rules are very clear that "[p]roperly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response." NECivR 56.1(B) (emphasis in original).

Jones did none of this. *See generally* Filing 113. The Court's local rules provide that if a party files a brief that does not comply with NECivR. 56.1, then the Court "may require immediate

---

[6] As they acknowledge in their reply brief, Defendants should have filed a separate statement of material facts when they submitted their Opening Brief. *See* Filing 114 at 3 n.2. At the time Defendants filed their Motion, the applicable version of this Court's local rules stated that "[t]he statement of material facts shall be filed in a separate document from the motion for summary judgment and brief in support of the motion." NECivR 56.1(a)(4). Defendants did not comply with this requirement because they included their statement of material facts in the body of their brief, as had been the accepted practice under prior versions of this Court's local rules. However, because their noncompliance with this rule is a matter of form rather than substance, the Court does not find that any remedial or corrective measures are necessary. *See* NECivR 56.1(e). Defendants' statement of material facts otherwise complies with this Court's local rules because it consists of short, numbered paragraphs and is properly supported with pinpoint citations to evidence in the record. *See* NECivR 56.1(a)(2). Given that Jones did not respond to Defendants' statement of material facts anyway, the Court sees little utility at this stage in prolonging resolution of the matter by having Defendants refile what would essentially be a carbon-copy in a separate document. *See R.A.D. Servs. LLC v. State Farm Fire & Cas. Co.*, 60 F.4th 408, 412 (8th Cir. 2023) (per curium) ("The district court has considerable discretion in applying its local rules") (citation omitted).

[7] Initially, Jones missed the deadline for filing his opposition brief; however, he subsequently submitted a motion for an enlargement of time out of time. Filing 111. Although it was untimely by one day, the Court granted Jones's motion for an extension. Filing 112. Thereafter, Jones submitted his opposition brief within the extension window. Filing 113.

compliance or provide any other relief that the court deems appropriate." NECivR 56.1(e). Under these circumstances it is appropriate to deem the Defendants' properly referenced material facts to be admitted by Jones. *See* NECivR 56.1(B). This is particularly appropriate given that Jones has not submitted any evidence of his own for consideration on this Motion.[8]

### 2. *Rule 56 Standards*

Pursuant to Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. (a). "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Rusness v. Becker Cnty.*, 31 F.4th 606, 614 (8th Cir. 2022) (quoting *Doe v. Dardanelle Sch. Dist.*, 928 F.3d 722, 725 (8th Cir. 2019), in turn quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The moving party bears the burden of showing the absence of a genuine dispute." *Glover v. Bostrom*, 31 F.4th 601, 603 (8th Cir.) (citing Fed. R. Civ. P. 56(a)), *reh'g denied*, No. 20-2884, 2022 WL 1564097 (8th Cir. May 18, 2022). The party opposing summary judgment must "cit[e] particular materials in the record" or show that the "materials cited do not establish the ... absence of a genuine dispute." Fed. R. Civ. P. 56(c)(1).

On a motion for summary judgment, "a district court should 'not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue.'" *Avenoso v. Reliance Standard Life Ins. Co.*, 19 F.4th 1020, 1024 (8th Cir. 2021) (quoting *Great Plains Real*

---

[8] The Court acknowledges Jones's *pro se* status and recognizes that "[a] document filed *pro se* is 'to be liberally construed,' and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers[.]" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal citation omitted). Nevertheless, one's "status as a pro se litigant does not excuse him from complying with" Fed. R. Civ. P. 56 and NECivR 56.1. *Carter v. Muldoon*, No. 8:17CV319, 2018 WL 10228384, at *1 (D. Neb. Dec. 19, 2018), *aff'd*, 780 F. App'x 392 (8th Cir. 2019); *see also Bennett v. Dr. Pepper/Seven Up, Inc.*, 295 F.3d 805, 808 (8th Cir. 2002) (noting a litigant's *pro se* status "did not entitle him to disregard the Federal Rules of Civil Procedure," and further concluding that he failed to establish excusable neglect for missing a filing deadline where "[t]he local rule requiring a response to a summary judgment motion within twenty days was clear").

*Est. Dev., L.L.C. v. Union Cent. Life Ins*., 536 F.3d 939, 943-44 (8th Cir. 2008)). Instead, the court must view the evidence in the light most favorable to the non-moving party and afford that party all reasonable inferences supported by the evidence. *Grinnell Mut. Reinsurance Co. v. Dingmann Bros. Constr. of Richmond, Inc*., 34 F.4th 649, 652 (8th Cir. 2022); *Pearson v. Logan Univ*., 937 F.3d 1119, 1124 (8th Cir. 2019). "The Supreme Court's 'repeated' admonition is that 'the plaintiff, to survive the defendant's [summary judgment] motion, need only present evidence from which a jury might return a verdict in his favor.'" *Doe by next friend Rothert v. Chapman*, 30 F.4th 766, 772 (8th Cir. 2022) (quoting *Anderson*, 477 U.S. at 257).

### 3. *Qualified Immunity Standards*

The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Put differently, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Its protection applies "regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231 (internal quotation marks and citation omitted). Where a case involves multiple defendants, "[t]he doctrine of qualified immunity requires an individualized analysis as to each officer because a person may be held personally liable for a constitutional violation only if his *own* conduct violated a clearly established constitutional right[.]" *Manning v. Cotton*, 862 F.3d 663, 668 (8th Cir. 2017) (internal citations and quotation marks omitted) (emphasis in original).

Where the defense of qualified immunity is invoked "[o]n summary judgment, a defendant official is entitled to qualified immunity unless (1) the facts, viewed in the light most favorable to

the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Walton v. Dawson*, 752 F.3d 1109, 1116 (8th Cir. 2014) (internal quotation marks omitted). Under this two-pronged inquiry, "courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *Ashcroft*, 563 U.S. at 735. A district court may find for the defendant on either prong, but it "may not deny qualified immunity without answering both questions in the plaintiff's favor." *See Watson v. Boyd*, 2 F.4th 1106, 1112 (8th Cir. 2021) (quoting *Walton*, 752 F.3d at 1116). For example, in the Eighth Circuit's en banc opinion in *Morgan v. Robinson*, the court concluded that it "need not decide" whether a constitutional violation occurred because the defendant "did not violate a 'clearly established statutory or constitutional right[ ] of which a reasonable person would have known.'" 920 F.3d 521, 523 (8th Cir. 2019) (en banc) (alteration in original) (quoting *Pearson*, 555 U.S. at 231). "As such, a district court 'should [not] deny summary judgment any time a material issue of fact remains on the [constitutional violation] claim [because to do so] could undermine the goal of qualified immunity.'" *Watson*, 2 F.4th at 1112 (quoting *Jones v. McNeese*, 675 F.3d 1158, 1161 (8th Cir. 2012) (alterations in original).

In this context, a right is clearly established if it is "sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (alteration in original) (internal quotation marks omitted) (quoting *Ashcroft*, 563 U.S. at 741). The Supreme Court has continually "reiterate[d] the longstanding principle that 'clearly established law; should not be defined 'at a high level of generality.'" *White v. Pauly*, 580 U.S. 73, 79 (2017) (quoting *Ashcroft*, 563 U.S. at 742). Thus, "the clearly established law must be 'particularized' to the facts of the case." *White*, 580 U.S. at 79 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The plaintiff "has the burden to demonstrate that the law is

clearly established." *Morgan*, 920 F.3d at 524. To carry this burden, he "must identify either controlling authority or a robust consensus of cases of persuasive authority that placed the statutory or constitutional question beyond the debate at the time of the alleged violation." *Kelsay v. Ernst* 933 F.3d 975, 979 (8th Cir. 2019) (en banc) (internal quotation marks and citation omitted).

  *4. The Fourth Amendment Claims*

    a. The Unlawful Search Claim

  In its December 12, 2021, Order, the Court previously determined that the Defendants involved in Jones's Fourth Amendment unlawful search claim were each entitled to qualified immunity. *See* Filing 60 at 8. Because the Court concluded that the search of Jones's "possessions when he arrived at NRC did not violate clearly established law[,]" the Court dismissed his Fourth Amendment unlawful search claim. Filing 60 at 9, 11–12. The Court similarly concluded that the Defendants were entitled to qualified immunity based on Jones's claim that they searched his room at NRC outside of his presence. Filing 60 at 8 (citing *Arnzen v. Palmer*, 713 F.3d 369, 372 (8th Cir. 2013)). At the time the Court issued that Order, however, Defendants Deiterman and Chris Neuhaus were not parties to the suit because they had yet to be served. *See* Filing 69 at 2; Filing 71 at 2. Defendants Deiterman and Chris Neuhaus now contend that "the same rationale the Court applied in its previous dismissal of the Fourth Amendment unlawful search claim should apply to" them as well. Filing 109 at 22. Because there is nothing that distinguishes Deiterman or Chris Neuhaus from any of the other Defendants who previously prevailed on this unlawful search claim, the Court agrees.

  The Court relies on and incorporates the rationale it expressed in its prior Order, Filing 60 at 8–9, in concluding that no clearly established Fourth Amendment violation based on any search occurred here. The same rationale it expressed then applies equally to Deiterman and Chris Neuhaus now. As the Court previously explained, "[i]nvoluntarily civilly committed persons retain

16

the Fourth Amendment right to be free from unreasonable searches that is analogous to the right retained by pretrial detainees." Filing 60 at 8 (quoting *Arnzen*, 713 F.3d at 372). Because civilly committed persons do not maintain a reasonable expectation of privacy in their rooms, *see id.*, the room searches Jones complains of did not violate clearly established law. *See* Filing 60 at 8–9 (reaching the same conclusion with respect to other Defendants and citing cases).

The same is true of Jones's claim that his property was unlawfully searched when he was re-admitted to NRC in 2020. *See* Filing 12 at 31. "Although an involuntarily committed patient of a state hospital is not a prisoner per se, his confinement is subject to the same safety and security concerns as that of a prisoner." *Beaulieu v. Ludeman*, 690 F.3d 1017, 1028 (8th Cir. 2012) (internal quotation marks omitted). The Supreme Court has recognized that "correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 328 (2012). Necessarily, these officials "have a significant interest in conducting a thorough search as a standard part of the intake process." *Id.* at 330. To the extent that Jones's personal effects were search by Deiterman and Chris Neuhaus upon his re-admission to NRC as part of an inventory search, there is no evidence before the Court that any such search violated clearly established law. For the foregoing reasons, Deiterman and Chris Neuhaus are entitled to qualified immunity on Jones's Fourth Amendment unlawful search claim.

b.   The Unlawful Seizure Claim

i.   The Parties' Arguments

Defendants argue that "Jones cannot establish that any Defendant had any personal or direct involvement in any alleged seizure of his legal documents or materials." Filing 109 at 17. Defendants emphasize that apart from an instance on October 26, 2022, where Jones's excess papers were relocated to a storage room, "there is no record of any NRC staff member taking,

removing, or destroying any of Jones's papers, legal or otherwise." Filing 109 at 20 (citing Filing 107-16 at 3 (¶9)).[9] Defendants also emphasize that when Jones was asked in discovery to specifically identify the individuals he claims unlawfully seized his documents or materials, Jones did not name any particular persons. *See* Filing 109 at 20–21 (citing Filing 107-8 at 6; Filing 107-9 at 2). Defendants also argue that apart from December 7, 2020—the day he was readmitted to NRC—Jones has not provided even an approximation of when any other alleged seizure occurred. Filing 109 at 21.

Jones's opposition brief barely addresses his Fourth Amendment seizure claim. *See generally* Filing 113. However, his brief does state the following:

> Plaintiff asserts that the Defendants have no justification for confiscating his legal case laws [sic], and legal notes, and his missing legal papers during the room searches, *see* *Zilich v. Lucht*, 981 F.2d 694, 696 (3rd Cir. 1992)[.] Materials essential to court access are not just property, their [sic] intentional confiscation states a federal law claim that may be litigated in federal court; *Cody v. Weber*, 256 F.3d 764 768–69 (8th Cir. 2001) [(]holding allegation that prison staff read plaintiff's legal papers during searches stated a constitutional claim[)].

Filing 113 at 10 (lowercase typeface substituted and italics added where appropriate).

In the portion of his opposition brief captioned "CONCLUSION," Jones also adds: "The Defendants have shown no exigent circumstances justifying the seizure of Plaintiff [sic] legal documents, legal papers, and legal notes, or searching Plaintiff [sic] legal papers outside of Plaintiff's presence, and without Plaintiff's permission." Filing 109 at 113 at 12 (lowercase typeface substituted where appropriate).

### ii.   Applicable Standards

"A seizure of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *Beaulieu v. Ludeman*, 690 F.3d 1017, 1034 (8th

---

[9] As the Court previously explained, the October 26, 2022, relocation of Jones's excess papers to a storage room is not at issue in this suit. Jones filed his operative Complaint well before then on March 11, 2021.

Cir. 2012) (internal quotation marks omitted). However, "the Fourth Amendment only protects against 'unreasonable' seizures." *Brown v. City of Bloomington*, No. CV 15-11(DSD/DTS), 2018 WL 3614125, at \*5 (D. Minn. July 27, 2018). "To determine the constitutionality of a seizure, [courts] must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests alleges to justify the intrusion." *Beaulieu*, 690 F.3d at 1034 (internal quotation marks omitted). Unlawful seizure claims brought by civilly committed individuals are generally analyzed under the same standard as unlawful seizure claims brought by pretrial detainees. *See Andrews v. Neer*, 253 F.3d 1052, 1061 (8th Cir. 2001); *see also Serna v. Goodno*, 567 F.3d 944, 949 (8th Cir. 2009) ("[W]e can discern no justification for treating a Fourth Amendment claim based upon a search differently than a claim based upon a seizure. Thus, *Andrews*, which addresses a seizure claim, articulates the appropriate standard for considering whether an involuntarily committed person has been subjected to an unconstitutional search"). Accordingly, the Fourth Amendment analysis in this context requires "[b]alancing the nature of the intrusion against the need for institutional security[.]" *Beaulieu*, 690 F.3d at 1035.

    c.  Discussion

    There are potentially two alleged seizures are at issue in this case. The first seizure relates to when Jones was re-admitted to NRC in late 2020. Whether a second seizure occurred at all is less clear. Liberally construing Jones's Amended Complaint, the Court understands him to be claiming that if his personal property was not taken at the time it was inventoried when he was re-admitted to NRC, then it was taken by unspecified persons on a subsequent and unidentified occasion when his room was searched.[10] "A different Fourth Amendment violation cannot

---

[10] When Jones was asked in discovery to specifically identify what documents or materials he claims were unlawfully seized, Jones responded, "the documents that were taken doing room searches, legal paper, case laws, notes, legal notes, legal documents, legal attorneys notes." Filing 107-9 at 2; *see also* Filing 107-8 at 5–6. Defendants

transform a later, reasonable [seizure] into an unreasonable seizure." *Cnty. of Los Angeles, Calif. v. Mendez*, 581 U.S. 420, 423 (2017). Therefore, the Court will address these two potential seizures separately because the objective reasonableness analysis "must be conducted separately for each . . . seizure that is alleged to be unconstitutional." *Id.* at 428.

               i.    Jones's Claim as it Relates to his Readmission to NRC

The Court will begin by first addressing Jones's claim that his property was unlawfully seized when he was readmitted to NRC. Defendants do not dispute that when Jones was re-admitted to NRC in late 2020, "it took several days for four boxes of Jones's legal papers to make its way to [his] living unit," but they contend that "a short delay in unpacking, searching, and delivering "11 box[es] of property" does not constitute an unlawful seizure." Filing 109 at 18 (alteration in original). Nor do Defendants suggest that "retaining and searching Jones's property for several days upon readmission" would somehow not constitute a seizure. *See* Filing 109 at 19. Their position is that any such seizure would have been a "reasonable intrusion" under the circumstances. Filing 109 at 19.

As previously noted, the NRC officials would have had "a significant interest in conducting a thorough search as a standard part of the intake process." *See Florence*, 566 U.S. at 330. Jones has not pointed to—nor is the Court aware of—any authority clearly establishing that the relatively brief delay between when Jones's property arrived at NRC and when it was ultimately delivered to his unit amounted to an "unreasonable" seizure. *See Morgan v. Robinson*, 920 F.3d 521, 524 (8th Cir. 2019) (en banc) (noting that the plaintiff "has the burden to demonstrate that the law is clearly established"). The lack of authority to support such an assertion is unsurprising given the

---

proceed in their brief as though Jones has alleged two different seizures. *See* Filing 109 at 18 (addressing the seizure claim based upon Jones's readmission to NRC); Filing 109 at 18 (addressing the claim that a seizure occurred when Jones's room was searched); Filing 109 at 21. Liberally construing Jones's Complaint, the Court will do likewise.

need to ensure institutional security at NRC by prohibiting the introduction of contraband. *See Beaulieu*, 690 F.3d at 1035. Balancing the nature of the intrusion against NRC's security concerns, Jones has failed to demonstrate a clearly established violation of the Fourth Amendment based upon the time it took for his personal effects to be delivered to his living unit upon readmission to NRC. *Id.* (requiring such a balancing of interests).

As for Jones's allegation that he is missing property, there is simply no evidence that any of the Defendants named in this claim took, destroyed, or otherwise permanently deprived him of any personal effects or other materials. Jones did not submit any evidence along with his opposition brief, and merely reiterating his own allegations in his complaint is not sufficient to survive summary judgment. *See Ryan v. Cap. Contractors, Inc*., 679 F.3d 772, 776 (8th Cir. 2012) ("At the summary judgment stage, 'the nonmoving party must set forth specific facts sufficient to raise a genuine issue for trial and cannot rest on allegations in the pleadings'"). Even if the Court were to assume for the sake of argument that Jones is indeed missing certain personal effects, he points to nothing that would suggest any of the Defendants directly or personally caused this to happen. *See Benton v. Kelley*, 784 F. App'x 472, 473 (8th Cir. 2019) (citing *Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir. 1985) for the proposition that "§ 1983 liability requires personal involvement, or direct responsibility for, actions resulting in violation").

Indeed, Jones's own interrogatory answers undermine his claim. *See* Filing 107-8 at 6; Filing 107-9 at 2. When asked to identify who specifically took his materials, all Jones said was that when "security specialist [team] members" search his room they do not provide him with copies of their video recordings capturing the search or leave him with "a shakedown slip" describing what they took out of the room. Filing 107-9 at 2 (lowercase typeface substituted). Jones has not pointed to evidence that would permit a reasonable jury to find in his favor based "on more

than mere speculation, conjecture, or fantasy"; therefore, this claim cannot survive summary judgment. *See Moody v. St. Charles Cnty.*, 23 F.3d 1410, 1412 (8th Cir. 1994).

ii. Jones's Claim as it Relates to an Alleged Seizure that Occurred During the Search of his Room

To the extent Jones has alleged that his property was unlawfully taken from his room on some other occasion after he was readmitted to NRC, this claim fails as well. Although the Court considers this alleged seizure separately, *Mendez*, 581 U.S. at 428, it reaches the same result for the same reason. Once again, Jones has not pointed to any evidence that would permit a reasonable juror to conclude that Jones's effects went missing as the result of the personal or direct involvement on the part of any particular defendant. *See Martin*, 780 F.2d at 1338; *see also Benton*, 784 F. App'x at 473. Therefore, even if Jones's materials were seized from his room at some other point in time, his claim still cannot survive summary judgment.

5. *The Procedural Due Process Claim*

a. The Parties' Arguments

Defendants argue that "Jones does not have a liberty interest in his NRC privileges or to have contact with a fellow-peer." Filing 109 at 26. They likewise contend that qualified immunity shields them "because there is no clearly established right or liberty interest to such." Filing 109 at 26. Defendants alternatively posit that even if protected rights and liberty interests inured under these circumstances, "Jones had the requisite process available to him—he just didn't use it." Filing 109 at 27. Specifically, they maintain that Jones had the right to file a "patient grievance" but he "never complained, grieved, appealed, or communicated any issue relating to an alleged October 2018 incident, or his November 2019 Privilege Suspension to any NRC employee or Defendant." Filing 109 at 28–29. Jones's opposition filing is largely non-responsive to Defendants' specific arguments, but he does argue that he was subject to a number of "restrictions"

22

including being placed on "privilege suspension" and "limited privilege suspension." Filing 113 at 11. He also claims that he "has been scored lower, and the duration of [his] confinement has been prolonged by 3 ½ years because of the alleged sexually actouts [sic] and the 10 foots [sic] orders placed on [him]." Filing 113 at 11.

   b. Applicable Standards

  "To demonstrate a procedural-due-process violation, [the plaintiff] must show a deprivation of life, liberty, or property without sufficient process." *Hughes v. City of Cedar Rapids, Iowa*, 840 F.3d 987, 994 (8th Cir. 2016). In determining what process is due in a given situation, courts balance three factors. *Id.* They are:

> (1) the nature and weight of the private interest affected by the challenged official action; (2) the risk of an erroneous deprivation of such interest as a result of the summary procedures used; and (3) the governmental function involved and state interests served by such procedures, as well as the administrative and fiscal burdens, if any, that would result from the substitute procedures sought.

*Booker v. City of Saint Paul*, 762 F.3d 730, 734 (8th Cir. 2014) (quoting *Coleman v. Watt*, 40 F.3d 255, 260 (8th Cir. 1994) (in turn citing *Matthews v. Eldridge*, 424 U.S. 319 (1976)). Courts also consider the available procedures that plaintiffs chose not to pursue in evaluating the sufficiency of process. *Padda v. Becerra*, 37 F.4th 1376, 1383 (8th Cir. 2022).

  The Eighth Circuit has recognized that the liberty interests of civilly committed sex offenders "are considerably less than those held by members of free society." *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006). "As compared to a prison inmate, however," civilly committed sex offenders are still "entitled to more considerate treatment and conditions of confinement." *Id.* (internal quotation marks omitted). The nature of a civilly committed sex offender's "liberty interest in being free from isolation must therefore be understood in the context of that commitment and its accompanying restrictions." *Id.*

23

    c.  Discussion

      i.  The "Breaking Boundaries for Sexual Favors" Incident

Although Jones referenced an occasion when he was accused of "breaking boundaries against another peer for sexual favors" in his Amended Complaint, Filing 12 at 18 (¶34), he made no mention of this incident when asked to articulate the facts underlying his procedural due process claim in discovery. *See* Filing 107-4 at 5; Filing 107-5 at 1; *see also* Filing 109 at 13 n.6. Nor has Jones pointed to any evidence at this stage which supports this allegation in his Complaint. That alone entitles Defendants to summary judgment as to this specific allegation. *See Rusness v. Becker Cnty., Minnesota*, 31 F.4th 606, 614 (8th Cir. 2022) (noting the non-moving party's "affirmative burden to designate specific facts creating a triable controversy").

      ii.  The October 2018 "Sexual Act Out" Incident

As for Jones's procedural due process claim premised upon being accused of a "sexual act out" in October 2018, there is also no evidence that Jones was ever disciplined, suffered any adverse action, or received any "privilege suspension" as the result of this incident. *See* Filing 106-2 at 6. As Defendant Kris Boe Simmons stated in a sworn declaration, "There is no record of Jones receiving a [privilege suspension], nor any kind of consequence, for an alleged 'sexual act-out' in October of 2018." Filing 107-11 at 5 (¶13). Without any evidence that Jones suffered a deprivation to his liberty or property as the result of this incident, his procedural due process claim fails. *See Hughes*, 840 F.3d a*t* 994. Ironically, even Jones acknowledges in his opposition brief that, "Government actors are not required by the United States Constitution to provide process unless they are depriving someone of liberty or property." Filing 113 at 8 (lowercase typeface substituted). Without any accompanying infringement on his life, liberty, or property that followed as a result of this accusation, Jones has—at most—alleged that he is the victim of a false accusation. Yet, even if he was wrongly accused of a "sexual act out," that does not necessarily

trigger the need for procedural protections because "[m]ere injury to reputation, even if defamatory, does not constitute the deprivation of a liberty interes*t." Rochling v. Dep't of Veterans Aff*s., 725 F.3d 927, 931 (8th Cir. 2013*)* (citations omitt*ed); see also Doe v. Purdue Univ.*, 928 F.3d 652, 662 (7th Cir. 2019) (Barrett, J.) ("the loss of reputation is not itself a loss of liberty"). Accordingly, Defendants are entitled to summary judgment on this specific claim.

### iii.  The November 2019 One-Day Privilege Suspension and Ongoing 10-Foot Order

Jones's final basis for his procedural due process claim hinges on the privilege suspensions he received after he was found to have violated a no-contact order. *See* Filing 12 at 18 (¶34). Jones received a no-contact order in October 2019 that directed him to stay at least 10 feet away from a fellow peer at NRC. Filing 106-7 at 1. Unlike the October 2018, "sexual act out" incident, there is evidence that Jones suffered an adverse consequence based on an alleged violation of this no contact order. *See* Filing 106-8 at 1–3. Specifically, Jones was placed on "privilege suspension" for a period spanning less than 24 hours. *See* Filing 106-8 at 1 (showing that Jones's privilege suspension went into effect on November 14, 2019, at 12:17 P.M., but was discontinued on November 15, 2019, at 10:34 A.M.). Jones was asked in discovery to specifically identify what discipline, punishment, or privilege suspension was taken against him because of this infraction. Filing 107-4 at 6. He responded, "Privilege suspension were [sic] taken such as no extra drink privileges, no TV voting, no headphone privileges, no arts and crafts participation." Filing 107-5 at 2. Jones added that he is also still subject to the "10 foot order to stay away from each peer." Filing 107-5 at 2.

Jones has not pointed to any authority clearly establishing that as a civilly committed sex offender he had protected liberty or property interests in "extra drink privileges," "TV voting privileges," "headphone privileges," "arts and crafts participation" or the ability to associate with

specific peers at a distance of 10 feet or closer. It was his burden to do so to the extent he sought to overcome Defendants' qualified immunity defense. *Morgan*, 920 F.3d at 524. The Court is not aware of any such authority either. The lack of precedent to support this position should come as little surprise given that "[a]lthough an involuntarily committed patient of a state hospital is not a prisoner per se, his confinement is subject to the same safety and security concerns as that of a prisoner." *Revels v. Vincenz*, 382 F.3d 870, 874 (8th Cir. 2004); *see also Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006) (recognizing that the nature of a civilly committed patient's "liberty interest in being free from isolation must . . . be understood in the context of that commitment and its accompanying restrictions"). According to NRC's records, the reason the 10-foot order was imposed on Jones in the first place was "to aid in promoting healthy boundaries and maintain safety of patient." Filing 106-7 at 1. In the absence of any controlling precedent or a robust consensus of persuasive authority clearly establishing any such protected interests in these privileges, Defendants are entitled to qualified immunity. *Kelsay*, 933 F.3d at 979.

In addition to the privilege suspensions, Jones also claims that Defendants' imposition of a "10 foot order" and their determination that he engaged in "sexual actouts" caused him to be "scored lower." Filing 113 at 11. The Court understands Jones to be saying that as a result of these infractions, he received negative assessments in NRC's program that determines the privileges he is entitled to and his readiness for discharge. *See* Filing 107-12 at 17; Filing 107-11 at 2 (¶5). Specifically, Jones alleges that his term of civil confinement was "prolonged by 3 ½ years" as a result. Filing 113 at 11. Jones provides no evidence to support this assertion. While Defendant Kris Boe Simmons acknowledges in her sworn declaration that, "Privilege Suspensions and Unit Restrictions can impact a patient's Level Scoring," Filing 107-11 at 5 (¶14), she avers that "the single [privilege suspension] [Jones] received in November 2019 for violating a 10-foot order does

not, in and of itself, substantially affect level scoring and has not extended his stay at NRC." Filing 107-11 at 6 (¶15). Because Jones has not pointed to any evidence to support the contention that either his privilege suspension or "10-foot order" prolonged his stay at NRC, his claim cannot survive summary judgment.

Alternatively, and even if the Court were to assume for the sake of argument that this one-day privilege suspension and Jones's order to remain 10-feet away from specified peers at NRC implicates a protected property or liberty interest, there is no evidence that Jones availed himself of the procedures that were made available to him before he sought redress through a federal lawsuit. Jones was (and ostensibly still is) perfectly free to raise these concerns through the patient grievance process employed by NRC. *See generally* Filing 107-13 (NRC's "Patient Complaints, Concerns, and Grievances" policy that was in effect on August 12, 2019). As Defendants point out, "Jones has never complained, grieved, appealed, or communicated any issue relating to an alleged October 2018 incident, or his November 2019 Privilege Suspension to any NRC employee or Defendant." Filing 109 at 29 (citing Filing 107-11 at 6 (¶16); Filing 107-4 at 9; Filing 107-5 at 3). Given the nature and brevity of the privilege suspensions that were imposed along with the fact that Jones did not pursue other procedures that were available to him before filing suit, *see Padda*, 37 F.4th at 1383, the balance of factors does not support the conclusion that Jones has suffered a procedural due process violation.

## III.   CONCLUSION

The Court denies Jones's Motion to Compel and Jones's Motion for Restraining Order. The Court grants Defendants' Motion for Summary Judgment in full. All outstanding matters in this case have now been resolved and no claims remain. Therefore, this case is terminated. Accordingly,

It is ORDERED:

1.  Jones's Motion to Compel, Filing 89, is denied;

2.  Jones's Motion for Restraining Order, Filing 94, is denied;

3.  Defendants' Motion for Summary Judgment, Filing 104, is granted in full; and

4.  The Court will enter a separate judgment in accordance with this Order.

Dated this 30th day of March, 2023.

BY THE COURT:

Brian C. Buescher
United States District Judge